## Richmond

JAMES MATTHEW MILLER

v.

COMMONWEALTH OF VIRGINIA

No. 2070-90-2

Decided November 3, 1992

Counsel

Michael C. Allen; Frederick G. Rockwell, III (Hairfield, Morton, Allen & Rockwell, on brief), for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

**ELDER, J.**—James Matthew Miller, appellant, appeals from his convictions of first degree murder and use of a firearm in the commission of a felony. At trial, appellant asserted that he was legally insane at the time of the offenses. For the reasons that follow, we affirm the judgment of the trial court.

Appellant and Dean Scott Phillips knew each other from high school. A history of tension marked their relationship, and acquaintances reported that, over time, the two boys' dislike for one another had intensified. Phillips mocked Miller for his personal appearance and his involvement in ROTC. One youth reported that Miller had repeatedly expressed his hatred for Phillips, as well as a desire "to get rid of him." A friend of Miller testified that Miller had vowed to kill Phillips.

In the spring of 1989, three students, including Miller, used free time in an English class to discuss how to kill someone and get away with it. The discussion included suggestions that there should be no witnesses, that the weapon should be unregistered, and that the body should be disposed of in a wooded area where it would not be found.

Following graduation from high school, Miller took a job as an apprentice roofer, only to find Phillips as his co-worker. Despite an apparent truce between them, Miller reportedly continued to harbor resentment against Phillips. One day after work, on July 26, 1989, the two decided to go to a wooded area to ride Miller's All Terrain Vehicle (ATV). It was there, using an AK47 rifle which someone had stolen from William Trail in October or November of the preceding year, that Miller shot Phillips five times, killing him. Miller fired the first

bullet into Phillips' back. Then, taking aim at Phillips' prone body, he fired four more times, including once to the head. Using rope to tie Phillips to the ATV, Miller dragged him approximately 900 feet. Leaving the body hidden in brush, Miller returned to Phillips' car and moved it from the scene of the shooting.

Miller spent that evening with his family, saying nothing about the shooting. He took a double dose of sleeping pills that night and, having overslept the next morning, was awakened by his employer calling to find out if he had seen Phillips. Miller told his employer that he had not seen Phillips since the previous afternoon, when the two went to a fast food restaurant together.

That morning, Miller told his mother and stepfather there had been an accidental shooting. He reported that Phillips had aimed at him and pulled the trigger, but that the gun had failed to discharge. According to this version of the incident, the gun first discharged during an ensuing struggle. Later that same day, he told his girl friend that an accidental shooting had followed a struggle. He explained to her that, when he and Phillips were shooting the rifle, Miller turned around to find Phillips pointing the rifle at him. He also told her that, after the first shot had struck Phillips, Phillips asked Miller to shoot him again, and that Miller had done so before moving the body and the car. He added that, while riding home, he threw Phillips' keys and wallet out the window.

Two weeks later, while hospitalized, Miller told his stepfather that he and Phillips had been dirt bike riding on the day of the shooting but that, when they had finished, Miller turned around to find Phillips pointing a gun at him. Miller lunged at Phillips, and during the ensuing struggle the gun went off. Miller admitted to his stepfather that he had moved the body and the car, explaining that he had not wanted anyone to find the body before he had a chance to report the death.

A number of experts examined Miller. Two days after the murder, Dr. Assad Masri, a psychiatrist, found Miller to be depressed and suicidal. He described Miller as an obsessive compulsive with a great deal of repressed anger. Dr. Masri also described Miller as "very vulnerable" to losing "all kinds of perceptions and all kinds of boundaries." According to Dr. Masri, Miller's perception that Phillips was taunting him triggered a rage that prompted him to fire at Phillips. Noting that Miller's deadly response to the perceived slight did not reflect the reality of the situation, Dr. Masri concluded that Miller had

experienced a psychotic episode and that, in firing the gun, he did not understand right from wrong.

Dr. George Pratsinak, a clinical psychologist, concluded that Miller was clinically depressed. He found a personality disorder marked by compulsiveness, depression, and narcissistic and histrionic features. According to Dr. Pratsinak, Miller would respond to stress by exerting "overcontrol." Although Dr. Pratsinak testified that he found no evidence that Miller had ever suffered a psychotic episode, he also stated that "[t]here is a potential where fear and anger can contaminate his thinking to a point where psychosis could appear."

Dr. Leo Kervin, also a psychiatrist, concluded that, at the time of the shooting, Miller was "consumed with his delusional psychosis and was not conscious of the seriousness of the consequences of such an act."

Yet another psychiatrist, Dr. James Dimitris, believed that Miller "was not impaired or afflicted or affected" by any mental condition "to the point where he didn't know what he was doing or what he was doing was wrong." Dr. Dimitris concluded that Miller knew right from wrong when he shot Phillips. Dr. William Lee, a clinical psychologist, agreed with Dr. Dimitris that, at the time of the shooting, Miller knew that what he was doing was wrong and that he was "clearly aware of the nature and character and consequences of his actions." Dr. Lee described Miller's condition as "a nonpsychotic personality disorder or personality trait disorder."

Appellant asserts that the trial court erred in allowing the prosecution to present evidence that, in the spring of 1989, or several months prior to the killing, he had engaged in a discussion with two classmates centered on how to murder someone and get away with it. Because the conversation at no point touched on the killing of Phillips specifically, and because of the potentially inflammatory nature of this conversation as evidence, its exact terms are key to our understanding of the issue.

As an initial matter, however, it is necessary to review the law governing this appeal. A trial court has broad discretion in determining whether evidence is admissible, and its ruling will not be disturbed absent an abuse of discretion. *Blain v. Commonwealth*, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988) (citing *Coe v. Commonwealth*, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986)). "Evidence is admissible if it

is both relevant and material." *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 196, 361 S.E.2d 436, 441 (1987). "Evidence is material if it relates to a matter properly at issue," and " '[e]vidence is relevant if it tends to establish the proposition for which it is offered.' " *Id.* (quoting Charles E. Friend, *The Law of Evidence in Virginia* § 134 (2d ed. 1983)). Here, the evidence was offered to establish premeditation, a matter properly at issue in a trial for capital murder. Moreover, while the discussion might not establish premeditation in itself, it does tend to establish it.

■ While "evidence should be excluded if the prejudicial effect of the evidence outweighs its probative value," the mere fact that "some prejudice may result does not justify automatic exclusion." *Id.* Thus, the fact that the evidence at issue here could have had a prejudicial impact on the jury is insufficient to mandate its exclusion. Instead, the trial court was required to weigh any potential prejudicial impact the evidence might have against its probative value.

Contrary to appellant's assertion on appeal, the record, while not containing evidence of precise comments made by each of the three participants, does contain clear evidence of appellant's participation in the discussion of how to commit a murder and get away with it. Evidence further established that the following conclusions emerged from that discussion: that a victim's body should be hidden in a wooded area, where it would not be found; that there should be no witnesses; and that use of an unregistered weapon would "avoid ballistic tracing." Evidence concerning the circumstances surrounding the actual shooting generally conformed to the suggestions that arose from the discussion. After the shooting, appellant moved Phillips' body further into a wooded area. No one witnessed the shooting. Although the weapon used was not unregistered, it had been stolen in an unsolved theft, making any "ballistic tracing" of the rifle directly to appellant unlikely. Because the circumstances of the shooting generally conformed to the suggestions that arose from the conversation, and because evidence of the discussion went to establish premeditation, we conclude that the trial court did not abuse its discretion in admitting evidence of that discussion, despite its potential for prejudicial impact.

Appellant next contends that the trial court erred in admitting evidence that, eight to nine months prior to the offense, he committed an uncharged theft of the weapon used to shoot Phillips. We disagree.

■ The evidence established that the rifle had been stolen and that, at some point prior to the killing, it came into appellant's possession. The prosecution did not state as a fact that appellant stole the gun. He merely argued that the jury could "draw that conclusion from those facts." "Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is admissible." *Cantrell v. Commonwealth*, 7 Va. App. 269, 287, 373 S.E.2d 328, 337 (1988) (citation omitted). At issue here was whether appellant planned the killing. As already noted, use of a stolen weapon in the commission of a killing could make the tracing of the bullets to the perpetrator more difficult. The fact that appellant used a stolen weapon, not whether he stole it, was relevant at trial to the critical question of premeditation.

Appellant further asserts that the trial court erred in refusing to allow evidence that, at the time of the shooting, he lacked the mental capacity to form the intent to kill. The Commonwealth counters that such evidence was never proffered. We agree. At trial, counsel for appellant quite clearly limited his questioning and argument to the issue whether appellant had the capacity to form an intent to commit robbery. Appellant was acquitted on the robbery indictment. Under Rule 5A:18, appellant is barred from raising this issue for the first time on appeal. We note that at another point in the trial appellant's psychiatrist testified, without objection, "I don't think he [appellant] was able to formulate any intentional task."

Appellant next contends that the trial court erred in instructing the jury that it could consider previously received evidence of appellant's account of the shooting, made to his medical experts, only for the limited purpose of deciding the issue of insanity. The issue of limiting the purpose for which this evidence could be used was raised for the first time when the Commonwealth requested a limiting instruction at the conclusion of all of the evidence. It is appellant's position that, because the Commonwealth failed to object to the evidence when it was first offered, an assertion the Commonwealth does not contest, the Commonwealth waived its right to ask for an otherwise valid limiting instruction. It is important to note that the objection is not to the admissiblity of the evidence or the accuracy of the instruction, but to the timeliness of the request for the instruction.

In his accounts of the shooting to mental health experts, appellant reported that he shot Phillips in the back without provocation; that there had been no struggle over the weapon; that appellant continued

to fire bullets into Phillips as Phillips fell, aiming a last one at the head; and that he subsequently made efforts to cover up his involvement in the shooting. We believe that, in light of the jury's finding that appellant was not insane, consideration by the jury of appellant's accounts to medical professionals could only have proven harmful to appellant. Under these facts, the timing of the Commonwealth's request for the limiting instruction could not have been prejudicial to appellant. Thus, while there may be circumstances where the giving of an otherwise proper limiting instruction at the conclusion of all the evidence without prior request may be unfairly prejudicial and constitute error, such is not the case before us.

Finally, appellant contends that the trial court improperly refused to instruct the jury on the consequences of a verdict of not guilty by reason of insanity. Appellant argues that the jury should have been told that, pursuant to a finding of not guilty by reason of insanity, appellant would not be set free but instead would be committed to the custody of state mental health authorities.

In rejecting such an instruction, the trial court correctly interpreted case precedent in Virginia. In *Spruill v. Commonwealth*, 221 Va. 475, 271 S.E.2d 419 (1980), the Supreme Court rejected a claim that the jury should be provided with "the detailed administrative procedures to be followed by the court and the Commissioner of Mental Health and Mental Retardation . . . when a defendant is acquitted by reason of insanity." *Id.* at 486, 271 S.E.2d at 426. The Court noted that these were statutory requirements directed to the court and not to the jury. *Id.* In so holding the Court relied on its decision in *Rollins v. Commonwealth*, 207 Va. 575, 151 S.E.2d 622 (1966), *cert. denied*, 386 U.S. 1026 (1967). In *Rollins*, the Court rejected part of an instruction which would have informed the jury that, pursuant to an acquittal on the ground of insanity, "the Court shall thereupon, if it deems his discharge dangerous to the public peace or safety, order him to be committed to the proper State hospital for the insane to be confined there under special observation and custody until the superintendent of that hospital and the superintendent of any other State hospital shall pronounce him sane and safe to be at large." *Id.* at 582-83, 151 S.E.2d at 627.

Appellant seeks to distinguish his proffered instruction from that rejected in *Spruill*. Appellant's instruction stated:

If you find the defendant . . . guilty, you should impose such punishment as you feel is just under the evidence and within the instructions of the court. If you find the defendant not guilty by reason of insanity, the court shall commit him to the custody of the Commissioner of Mental Health and Mental Retardation. In either event, you are not to concern yourself with what may happen afterwards.

According to appellant, his proffered instruction, unlike that in *Spruill*, did not ask the jury to consider detailed administrative procedures.

Appellant's proffered instruction suffered from the same defect as that identified by the Supreme Court in *Spruill* and *Rollins*. In each case, the instruction asked the jury to concern itself with the consequences to a defendant of an acquittal by reason of insanity. As interpreted by the Virginia Supreme Court, the language in the statute that details these consequences specifically directs itself to the attention of the court. *See* Code § 19.2-181.

■ Appellant argues that a jury unaware of the consequences to a defendant of a verdict of not guilty by reason of insanity will be unwilling to arrive at such a verdict. The jury was in fact instructed as follows:

If you find from the greater weight of the evidence that at the time of the offense the defendant was insane, then you must find him not guilty by reason of insanity even though you find that he committed the offense.

On appeal, we will "presume, unless the record expressly shows otherwise, that juries conscientiously follow an explicit cautionary instruction." *Hall v. Commonwealth*, 233 Va. 369, 375 n.*, 355 S.E.2d 591, 595 n.** (1987). Nothing in the record on this appeal undermines this presumption.

The judgment of the trial court is affirmed.

*Affirmed.*

Willis, J., concurred.

Benton, J., dissenting.

In its case-in-chief, the Commonwealth was permitted to prove, over objection, that several months before James Matthew Miller shot

Dean Scott Phillips, Miller was present in a classroom with Michael Waters and Matthew Scott Benson. Benson testified that the following occurred:

A We had a free day and we were just sitting around, talking. Us three guys were in a group, just talking, and we just brought it up. I believe *I said* something to the effect of how easy it might be to, you know, kill somebody and get away with it because we always talked about kind of weird stuff. Then the conversation just got rolling and went on for maybe five or six minutes.

Q Did the defendant participate in the discussion?

A Yes, he did.

Q What were the conclusions, if you will, or the things that you discussed about how to kill someone and get away with it?

A Well, what I remember of this conversation, *I remember talking about the body being taken to the woods.* I remember something about trying to make sure there are no witnesses. That is about all I can remember of that conversation.

Waters was less specific in his recollection of the discussion:

A We were discussing the group and I believe that *Benson mentioned* — I can't remember the exact words. *He brought up the subject.* I can't remember the exact words.

Q And the subject was what?

A The way one could commit a murder and get away with it.

Q Now who was there in this discussion?

A The defendant, Matthew Benson, and myself.

Q Did the defendant take part in the discussion?

A Yes.

Q What was the result of the discussion? What did the group decide one should do to commit a murder and get away with it?

A There wasn't really a conclusion. It was tossed back and forth.

Q What were some of the ideas?

A One would use an unregistered weapon. It was assumed, I should add — it was assumed that it would be a shooting with a gun. One would use an unregistered weapon to avoid ballistic tracing. One should not have any weapon. And, dispose of the body in an area where it wouldn't be found.

Each of the witnesses recalled specific comments by Benson. However, no evidence proved that Miller made any statements during the discussion. In addition, no evidence proved that Miller advocated a point of view in this discussion or that he even recalled the discussion several months later when he killed Scott. By proving that a person other than Miller made statements that suggested a scenario bearing some vague resemblance to the incident in which Miller killed Scott, the Commonwealth was permitted to offer irrelevant but highly prejudicial evidence.

This evidence bears a close resemblance to the proof that this Court found impermissible in *Hall v. Commonwealth*, 14 Va. App. 65, 415 S.E.2d 439 (1992). In *Hall*, the Commonwealth introduced evidence of Hall's knowledge that a friend, Carter, was alleged to have shot his wife, Mrs. Carter, in the head in Northern Virginia and then drove to New York for the purpose of making several telephone calls to establish an alibi. *Id.* at 67-68, 415 S.E.2d at 441. The Commonwealth claimed that Hall, in an attempt to establish an alibi for himself, similarly had telephoned his daughter from his home the night his wife died. This Court rejected the Commonwealth's argument that "the evidence was relevant because it revealed a method of developing an alibi defense." *Id.* at 68, 415 S.E.2d at 441. The Court found, instead, that the evidence had little probative value because Hall knew Carter's alibi had failed, alibis are commonly employed in criminal defense, and proving a personal contact is a routine element of an alibi defense. The Court went on to note:

The principal effect of the description of Carter's crime was to suggest guilt by association. The prejudicial effect of that suggestion far outweighed any probative value that might be found in the suggestion that Hall might have learned from his friend's example.

*Id.* at 69, 415 S.E.2d at 442.

In this case, the Commonwealth claims the boys' conversation revealed that Miller plotted Phillips' murder and, thus, supported an inference of premeditation. This contention is unsupported by the evidence introduced. The conversation took place several months before Phillips' death. There is no indication that Miller said anything during this conversation or what he thought of his friends' theories. While Phillips' death bore some general characteristics of the bantering described by one of the other boys, killings often occur with a minimal number of witnesses. Moreover, it is unremarkable that a young person who suddenly and unexpectedly found himself involved in a great wrong instinctively might have tried to hide the evidence of his wrong before confessing.

''Evidence of one occurrence may be received to prove another separate occurrence, if it is shown that some logical connection exists between the two, such that the existence of the one makes the existence of the other more probable.'' *Hall*, 14 Va. App. at 68, 415 S.E.2d at 441. Nonetheless, ''the existence of intent cannot be based upon speculation or surmise.'' *Adkins v. Commonwealth*, 217 Va. 437, 440, 229 S.E.2d 869, 871 (1976).

> ''[I]f the circumstances have no intimate connection with the main fact; if they constitute no link in the chain of evidence; then, supposing them innocent, their admission, to be sure, may do no harm, yet they ought to be excluded, because they are irrelevant; but if they denote other guilt, they are not only irrelevant, but they do injury, because they have a tendency to prejudice the minds of the jury; and for this additional reason they ought to be excluded.''

*Copeland v. Commonwealth*, 13 Va. App. 450, 455, 412 S.E.2d 468, 471 (1991) (quoting *Walker v. Commonwealth*, 28 Va. (1 Leigh) 574, 576-77 (1829)). It is impermissible to allow ''the jury to grope in the realm of speculation for an inference or inferences not supported by facts proved from evidence presented.'' *Lugo v. Joy*, 215 Va. 39, 42, 205 S.E.2d 658, 661 (1974).

The effect of allowing testimony of another boy's hypothetical plotting months before the killing was to allow the jury to speculate about Miller's predisposition to commit murder, not premeditation. It is well-established that evidence of other acts which tend to show a defendant's ''proclivity to crime or his attitude'' is not admissible. *Rees v. Commonwealth*, 203 Va. 850, 870, 127 S.E.2d 406, 420 (1962),

*cert. denied*, 372 U.S. 964 (1963) (citing *Day v. Commonwealth*, 196 Va. 907, 86 S.E.2d 23 (1955), *Barber v. Commonwealth*, 182 Va. 858, 30 S.E.2d 565 (1944), *Limbaugh v. Commonwealth*, 149 Va. 383, 140 S.E. 133 (1927), *Walker v. Commonwealth*, 28 Va. (1 Leigh) 574 (1829)). "Evidence of other independent acts of an accused is inadmissible if relevant only to show a probability that the accused committed the crime for which he is on trial because he is a person of bad or criminal character." *Copeland*, 13 Va. App. at 454, 412 S.E.2d at 470 (quoting *Sutphin v. Commonwealth*, 1 Va. App. 241, 245, 337 S.E.2d 897, 899 (1985)). The testimony describing the conversation served no purpose but to allow the jury to conclude that a macabre discussion by a teenage boy who had no connection to the killing was actually part of a diabolical and murderous scheme created by Miller. Its admission served only to prejudice the minds of the jurors.

The trial judge also permitted the Commonwealth to prove, over Miller's objection, that the weapon Miller used was stolen. The Commonwealth had asserted that "[t]he Commonwealth will argue that Miller stole the gun." Using the fact that Miller possessed the stolen gun, the Commonwealth argued to the jury that it could find from the evidence "that [Miller] stole the gun." While the majority concludes that this evidence is relevant to "whether [Miller] planned the killing," the evidence does not tend to prove that assertion. Moreover, proof of the circumstances surrounding the theft of the weapon was irrelevant to any issues before the jury.

The majority posits that Miller's plan to kill Phillips had its genesis in a conversation with Benson and Waters. During this conversation, another boy discussed the desirability of using an unregistered weapon. The majority states that "[a]lthough the weapon used was not unregistered, it had been stolen in an unsolved theft." However, uncontroverted testimony proved that the weapon was stolen "eight or nine months" before the crime (in October or November of 1988). The other boy initiated the conversation in the late "spring of 1989." The majority's theory, thus, collapses because the actual theft of the weapon could have played no part in a plan that was originated by another person after the theft.

All evidence that Miller was, in fact, the person who stole the weapon is irrelevant and, therefore, inadmissible "other crime" evidence. The circumstances of the weapon's theft proved no matter that was at

issue. Therefore, Robert Thacker's testimony concerning the circumstances of the theft was inadmissible. The Commonwealth underscored this inadmissible evidence when it explained to the jury that the evidence had been offered to "establish . . . the conclusion that [Miller] stole [the gun]."

The rule that forbids the introduction of evidence of other crimes, insofar as it establishes a criminal tendency on the part of the accused, is not a mere technical rule of law.

"It arises out of the fundamental demand for justice and fairness which lies at the basis of our jurisprudence. If such evidence were allowed, not only would the time of courts be wasted in the trial of collateral issues, but persons accused of crime would be greatly prejudiced before juries and would be otherwise embarrassed in presenting their defenses of the issues really on trial."

*Foster v. Commonwealth*, 5 Va. App. 316, 320-21, 362 S.E.2d 745, 747-48 (1987) (quoting *Lovely v. United States*, 169 F.2d 386, 389 (4th Cir. 1948)). Whether Miller stole the gun was not probative of any fact at issue. Its admission was reversible error.

Evidence which has no tendency to prove guilt, but only serves to prejudice an accused, should be excluded on the ground of lack of relevancy. For evidence to be admissible it must relate and be confined to the matters in issue and tend to prove an offense or be pertinent thereto. Evidence of collateral facts or those incapable of affording any reasonable presumption or inference on matters in issue, because too remote or irrelevant, cannot be accepted in evidence.

*Bunting v. Commonwealth*, 208 Va. 309, 314, 157 S.E.2d 204, 208 (1967).

For these reasons, I would reverse the convictions and remand the case for a new trial.